STATE of Tennessee ex rel. COLLIER
et al., Appellants,

v.

CITY OF PIGEON FORGE et
al., Appellees.

Supreme Court of Tennessee.

June 2, 1980.

Ronald E. Sharp, Hailey, Waters, Sykes & Sharp, Sevierville, for appellants.

Gary R. Wade, Ogle & Wade, Sevierville, for appellees.

## OPINION

HENRY, Justice.

This is a suit in the nature of a quo warranto proceeding instituted pursuant to Section 6–310, T.C.A., to contest the validity of a zoning ordinance of the municipality of Pigeon Forge. The Trial Judge upheld the ordinance. We affirm.

## I.

### The City of Pigeon Forge

Pigeon Forge is situated astride U.S. Highway 441 (The Parkway), which is the principal traffic artery from Knoxville into the Great Smoky Mountain National Park and Gatlinburg. It is a progeny of the phenomenal growth and development of the "fabulous and fascinating resort"[1] city of Gatlinburg.

As Gatlinburg developed and expanded and its real estate became more expensive and scarce, an overflow resulted and commercial utilization crawled down the Parkway to the theretofore undeveloped village of Pigeon Forge. The first motels and restaurants were located nearest Gatlinburg and gradually the development inched its way in the direction of Sevierville.

Thus, the town of Pigeon Forge came into existence. It was incorporated in 1961. The growth has been dramatic from a standpoint of commercial activity, virtually all of which is tourist oriented. It has become a smaller Gatlinburg made attractive by enterprising business leaders who have created a tourist mecca in its own right. While its resident population is small—approximately 1,880—it is saturated with motels, restaurants and places of amusement.

Pigeon Forge is a linear city, approximately three and one-half miles long with commercial developments along either side of Highway 441. Except for two protrusions (Silver Dollar City and Tommy Bartletts), it generally runs back from the highway only a block or so in depth. It is

evident that the initial incorporation was extended primarily to encompass the commercial enterprises and regulate the orderly growth and development of the city.

As time passed by history began to repeat itself. The commercial development of Pigeon Forge spilled over beyond its corporate limits to the Little Pigeon River and the northern most boundary of Sevierville. This area—from Pigeon Forge to Sevierville—is the only portion of U.S. Highway 441 not under municipal control from the North Carolina-Tennessee line to Sevierville, except for the lands embraced in the Great Smoky Mountains National Park. This strip is but a continuation of Pigeon Forge and is geographically and topographically inseparable therewith.

## II.

### The Annexation

It is this area that Pigeon Forge has annexed. It is approximately one mile long and is situated astride Highway 441 with 200 feet on each side. Thus, it is one mile long and its width is 400 feet plus the width of the highway. Its population is 47 persons. It is adjacent to the northern city limits of Pigeon Forge and "adjoin[s] its existing boundaries." Section 6–309, T.C.A.

So nearly does it resemble the existing City of Pigeon Forge that the Executive Director of the Tennessee Municipal Technical Advisory Service, in testifying at the trial, commented thusly:

> [Y]ou wouldn't know that it is not a part of that urban community if you didn't see that sign there in certain parts that says "Welcome to the City Limits of Pigeon Forge."

> \*     \*     \*     \*     \*     \*

It is all a part of that urban development.

We should emphasize that this is not, as appellants insist, merely a "strip" or "shoestring" or "corridor" annexation, al-

1. *See Cole v. Dych*, 535 S.W.2d 315, 316 (Tenn.1976).

though it is long and lean. Such annexations, so long as they take in people, private property, or commercial activities and rest on some reasonable and rational basis, are not *per se* to be condemned. We do not deal with an annexation wherein a city attempts to run its corporate limits down the right-of-way of an established road without taking in a single citizen or a single piece of private property. Such an annexation is perhaps questionable and is not here involved. As in any annexation, and more particularly one wherein a geometrically irregular parcel of land is annexed, the Court must scrutinize the stated and ostensible purpose of the annexation.

The record shows that the officials of the City of Pigeon Forge were motivated by a civic-minded compulsion to control and coordinate the expansion and growth of the city and insure that its development was on an orderly basis, in keeping with the character of the existing city. Additionally they were concerned about aesthetic considerations.

### III.

### *The Purposes of Annexation*

This Court commented on the theory and purposes of annexation in *City of Kingsport v. State ex rel. Crown Enterprises, Inc.*, 562 S.W.2d 808 (Tenn.1978), as follows:

The whole theory of annexation is that it is a device by which a municipal corporation may *plan for its orderly growth and development.* Heavily involved in this is control of *fringe area developments* and zoning measures to the end that areas of unsafe, unsanitary and substandard housing may not "ring" the City to the detriment of the City as a whole. In a word, annexation gives a city some *control over its own destiny.* The preservation of property values, the prevention of the development of incipient slum areas, adequate police protection within a metropolitan area, and the extension of city services to those who are already a part of

the city as a practical proposition, are the legitimate concern of any progressive city. (Emphasis supplied) 562 S.W.2d at 814

This reasoning is equally, if not more, viable when dealing with an annexation of an area lying in the growth pattern of a tourist-oriented city. It has a vital concern in guarding against the helter-skelter establishment of commercial activities that may not be in harmony with those already in operation. Indeed, the prevention of incompatible commercial enterprises is a high municipal duty. The failure of a city to extend its corporate boundaries to embrace contiguous areas of growth and development is an abdication of responsibility. The time to annex is in the incipient stage of growth, lest the basic purpose of annexation be frustrated and the public interest suffer by the annexation of substandard areas.

Given these considerations, we hold that the ordinance of annexation represents a fair, reasonable and responsible effort by the City of Pigeon Forge to cause its municipal boundaries to keep apace of the growth and development of the city. The basic test must be whether the ordinance is "reasonable for the overall well-being of the communities involved." Section 6–310, T.C.A. We find that it is.

We declare the ordinance to be valid.

In making this declaration we have not overlooked the insistence of the appellants that they neither wanted nor needed the city services and that they had service equal to or exceeding those provided by the city. This is an old and familiar tune. Its factual accuracy is debatable.

We do not consider the need for city services to be of controlling significance. True, this is a factor to be taken into consideration along with others, but, as this Court held in *City of Kingsport, supra,* "[t]he whole process of annexation would be frustrated if the city could only annex those

properties then in need of city services." 562 S.W.2d at 814. Moreover, this record is replete with testimony showing a need for services provided by the city. A part of the basis for appellants' lack of need lies in the fact that already the city is directly providing some services and the annexed area is the indirect beneficiary of other services stemming from its proximity to the city.

■ The people and property owners of an area proposed for annexation have neither the moral nor legal right to stand aloof from the incorporated community of which they are a *de facto* part, enjoying most of the benefits, but disclaiming their duty to participate in providing these essential services. Nor do they have the right to block the orderly growth and development of the corporate community. The statutory test is the "overall well-being" of both the annexing city and the annexed community. This record shows a benefit to both; a detriment to neither.

■ While other factors may be considered, the primary test of the reasonableness of an annexation ordinance must be the planned and orderly growth and development of the city, taking into consideration the characteristics of the existing city and those of the area proposed for annexation.

Affirmed.

BROCK, C. J., and FONES, COOPER and HARBISON, JJ., concur.